**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**GARY MICHAEL MCNEIL,**

      **Plaintiff,**

**vs.**                        **CIVIL ACTION NO. 2:16-CV-09399**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered October 20, 2017 (Document No. 12.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 10 and 11.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for judgment on the pleadings (Document No. 10.), **DENY** Defendant's request to affirm the decision of the Commissioner (Document No. 11.); **REVERSE** the final decision of the

Commissioner; and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for the reasons stated *infra*.

## Procedural History

The Plaintiff, Gary Michael McNeil (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on November 15, 2012 and November 19, 2012, respectively, alleging disability since October 31, 2012, because of "left femur fracture, left arm fracture, left hip fracture, sternal fracture, cardiac ventricular repair, partial right foot amputation, and hypertension." (Tr. at 213.) His claims were initially denied on April 18, 2013 (Tr. at 111-116.) and again upon reconsideration on September 18, 2013. (Tr. at 121-127, 128-134.) Thereafter, Claimant filed a written request for a hearing on November 15, 2013. (Tr. at 135-136.)

An administrative hearing was held on February 25, 2015 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 24-51.) On April 21, 2015, the ALJ entered an unfavorable decision. (Tr. at 5-23.) On May 12, 2015, Claimant sought review of the ALJ's decision by the Appeals Council. (Tr. at 4.) The ALJ's decision became the final decision of the Commissioner on August 8, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 1-3.)

On October 7, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 8 and 9.) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (Document No. 10.); in response, the Commissioner filed a Brief in Support of Defendant's Decision.

(Document No. 11.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was born on September 12, 1978 and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 31.) Claimant has a high school education. (Tr. at 32.) He last worked in October 2012 delivering food for a diner when he had a motor vehicle accident. (Id.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.

Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

### Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through September 30, 2015. (Tr. at 10, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of October 31, 2012. (Id., Finding No. 2.)

Under the second inquiry, the ALJ found that Claimant had the following severe impairments: status post patella fracture left knee; status post open reduction internal fixation (ORIF) left tibia; status post partial left foot amputation; and status post fractured sternum. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 12, Finding No. 4.)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work: "except he should never climb ropes, ladders, or scaffolds. He is able to

occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant should avoid all exposure to unprotected heights, extremes of cold, and vibrations." (Tr. at 13, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 16, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 16-17, Finding Nos. 7-10.)

Finally, the ALJ determined Claimant had not been under a disability from October 31, 2012 through the date of the decision. (Tr. at 18, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main errors in support of his appeal.

First, Claimant argues that the ALJ erred by failing to evaluate the severity of his mental impairments at step two in the sequential evaluation process, by selectively referencing evidence in the record favorable to his analysis that they were non-severe, and by rejecting two State agency opinions finding moderate limitations in each of the three functional domains. (Document No. 10 at 9-12.) Because the ALJ did not appreciate the severity of Claimant's mental impairments at step two, the resultant RFC is flawed, and the decision denying benefits is unsupported by the substantial evidence. (Id. at 12.)

As for his second alleged ground, Claimant argues that the ALJ erred at step three when he determined Claimant's physical impairments did not meet or equal Listing 1.02 or 1.06 criteria without any explanation. (Id. at 12-13.) Further, Claimant argues that the ALJ's discussion on his

need for a cane was contradictory and inaccurate with the record of evidence. (Id. at 13-14.)

Claimant asks the final decision be reversed and remanded to correct these errors. (Id. at 15.)

In response, the Commissioner argues the ALJ properly found Claimant's mental impairments were non-severe because the evidence indicated they did not interfere with his activities of daily living, and was supported by evidence from his primary care physician. (Document No. 11 at 6-7.) Next, the Commissioner contends that Claimant did not prove his physical impairments met all of the criteria of Listings 1.02 or 1.06. (Id. at 8.) Moreover, the medical evidence of record indicated that Claimant's fractures healed well, that his choice to use a cane was not medically necessary, and Claimant reported satisfaction with the level of pain control in May 2013. (Id. at 8-9.)

The Commissioner states that her final decision is supported by the substantial evidence and asks this Court to affirm. (Id. at 10.)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

**Evidence Concerning Mental Impairments:**

Adult Function Report:

On December 5, 2012, Claimant completed an Adult Function Report indicating he was confined to a wheelchair and required significant assistance with personal care from his fiancée and her daughter. (Tr. at 233-234.) He admitted to being unable to sleep secondary to pain, to

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

needing reminders to take his medicine, and to spending most of his day watching television and playing video games. (Tr. at 234-237.) While Claimant stated he could follow written and spoken instructions and get along with authority figures, he also indicated he could not handle stress or changes in his routine well and was experiencing frequent crying spells. (Tr. at 238-239.) Lastly, Claimant stated he was prescribed Prozac as well as Oxycodone, which caused sleepiness. (Tr. at 240.)

On June 1, 2013, Claimant completed an updated Adult Function Report in which he reported using a walker and described being unable to walk most days or to stand more than five minutes. (Tr. at 248.) He admitted to "terrible anxiety" that caused him to be physically sick when around more than a couple of people. (Id.) Claimant again complained he was unable to sleep at night due to pain and required the assistance of his fiancée for personal care. (Tr. at 249.) Claimant explained that he was afraid to drive a car and spent most days reading and watching television on days when his pain was manageable enough for him to concentrate. (Tr. at 252.) He stated he usually wanted to be alone and did not like being around others and admitted that he really did not get along with anyone. (Tr. at 253-254.) Claimant reiterated that he did not handle stress well due to his anxiety and had developed a fear of people and of driving. (Tr. at 254.) He reported no side effects from his medications. (Tr. at 255.)

Lincoln Primary Care Center:

Office treatment records dated July 31, 2013 through April 28, 2014 document Claimant was treated for "anxiety state, unspecified" by his primary care physician and was prescribed Prozac to manage his symptoms. (Tr. at 608-629.) Treatment notes reflect that in July and November 2013, Claimant's psychiatric evaluations were normal and he had no problems with

anxiety or depression. (Tr. at 608-609, 613-614.) His mental state was not interfering with activities of daily living. (Tr. at 609, 613.) In January 2014, Claimant's anxiety and depressive symptoms were described as "worse" and "seasonal." (Tr. at 618.) By April 2014, the quality of his symptoms had improved. (Tr. at 623.)

Psychological Consultative Examination:

On March 27, 2013, Claimant was evaluated by Angel Glick, M.A. (Tr. at 536-540.) Claimant reported a lifelong history of anxiety and depression that had worsened since his motor vehicle accident in 2012. (Tr. at 536.) Ms. Glick observed Claimant to walk with a rigid posture and slow gait and with the assistance of a cane. (Tr. at 538.) Significant mental status examination findings included an observed depressed mood and restricted affect, limited insight into the nature of his problems, average judgement, moderately deficient recent memory, mildly impaired remote memory, and moderately deficient concentration. (Tr. at 539.) Ms. Glick noted Claimant did not demonstrate a sense of humor and that he admitted to hallucinations that occurred approximately once a week and lasted for a few days per episode. (Tr. at 538-539.) Ms. Glick diagnosed Claimant with major depressive disorder, recurrent, severe with psychotic features. (Tr. at 540.)

State Agency Psychological Consultants:

On April 16, 2013, Todd Giardina, Ph.D. reviewed the then-existing record of evidence and found Claimant to have moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace with no episodes of decompensation. (Tr. at 57, 71.) Dr. Giardina concluded Claimant's affective disorder was a severe impairment. (Id.) Dr. Giardina completed a Mental Residual Functional Capacity assessment finding Claimant to be moderately limited in multiple basic mental functions: (1) the ability to maintain attention and concentration

for extended periods; (2) the ability to work in coordination with or in proximity to others without being distracted by them; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to interact appropriately with the general public; (5) the ability to get along with coworkers or peers without distracting them or exhibiting behavior extremes; and (6) the ability to respond appropriately to changes in the work setting. (Tr. at 61-62, 75-76.)

Dr. Giardina's opinions were affirmed as written by Jim Capage, Ph.D. on July 24, 2013. (Tr. at 87, 90-91, 101, 105-106.)

**Evidence Concerning Physical Impairments:**

Medical Records:

Claimant underwent a partial amputation of his left foot due to a gunshot wound in 2007. (Tr. at 544.) He returned to work following the amputation. (Tr. at 202.)

Claimant was involved in a motor vehicle accident and sustained a ruptured left ventricle, left knee fracture, left tibia fracture, right foot fracture, and a sternum fracture on October 21, 2012. (Tr. at 276-302.) He was discharged from the hospital on November 15, 2012, with a home nurse. (Tr. at 355-520.)

Upon a follow-up visit on January 23, 2013, an orthopedist, Shawn Storm, D.O., reported that x-rays showed that Claimant's impairments were healing "well." (Tr. at 522.) Dr. Storm weaned Claimant out of his cam boot, discontinued his left knee immobilizer, allowed for weight bearing as tolerated, and prescribed a walker. (Tr. at 523.)

Upon examination on May 13, 2013 with his primary care provider, Claimant had slight

muscular weakness of his left leg, ambulated with a cane, and his neurologic function was grossly unremarkable. (Tr. at 671.) Claimant reported satisfaction with the level of pain control. (Tr. at 669.)

Upon follow-up on July 31, 2013, Claimant had normal tone and motor strength, and normal gait and station. (Tr. at 675.) His cranial nerves were grossly intact and his coordination and cerebellum were normal. (Id.)

Consultative Medical Examination:

On September 4, 2013, Stephen Nutter, M.D. examined Claimant on behalf of the Agency. (Tr. at 544-549.) Claimant denied back or neck pain, but ambulated with a cane with a slow, limping gait, but was not unsteady, lurching or unpredictable. (Tr. at 545.) Dr. Nutter reported that Claimant "does not require a handheld assistive device." (Id.)

Claimant had clear lungs and symmetrical breath sounds. (Tr. at 545.) He had no accessory muscle recruitment and no chest tenderness to palpation. (Tr. at 545-546.)

Dr. Nutter noted Claimant had pain, tenderness, and crepitus of his left knee, but no redness, warmth, or laxity noted in the knees, ankles, or feet. (Tr. at 546.) He had no calf tenderness, redness, warmth, swelling, cord sign, or Homan's sign. (Id.) His left knee range of motion was almost normal. (Tr. at 546-547.) His lower extremities showed hip flexion and extension of 5/5 on the right and 3.5/5 on the left. (Tr. at 547.) His knee strength was equal bilaterally. (Id.) He could not walk on his heels/toes or perform tandem gait due to his foot amputation. (Id.) His cerebellar function was intact. (Id.) He could not squat due to knee pain, but there was no evidence of rheumatoid arthritis. (Tr. at 548.) He had no rheumatoid nodules, capsular thickening, periarticular swelling or tophi. (Id.) He had no ulnar deviation. (Id.)

12

Dr. Nutter opined that Claimant's left foot amputation interferes with his ability to balance and perform walking maneuvers. (Id.)

Laura C. Reese, D.O.:

In February 2014, Claimant fell on ice and suffered a comminuted fracture of the left patella with a superior displacement of multiple fractured bony fragments. (Tr. at 565, 567.) Claimant was referred to Dr. Reese, an orthopedic surgeon for evaluation. (Tr. at 604.) He returned to Dr. Reese on March 21, 2014 with his caregiver, reporting that he is worse and that he had twisted his knee a few times and was "ready to pursue the surgery." (Tr. at 603.) In April 2014, he underwent a left knee arthrotomy with synovectomy to remove loose bodies, patellar fragments, and articular cartilage and for debridement of hypertrophic fat pad and resection of a torn anterior horn lateral meniscus. (Tr. at 558.) However, Claimant continued to experience pain and swelling, and in May 2014 underwent a left knee arthroscopy. (Tr. at 551.)

At a follow-up examination in June 2014, Dr. Reese noted that Claimant had "very minimal swelling" and that his quad strength a little diminished, though he fatigues easily. (Tr. at 601.) Dr. Reese indicated quad strengthening, ice, and elevation as needed should be continued and she wanted Claimant evaluated for a foot prosthetic fitting. (Id.)

Loved Ones In Home Care:

Home care records from September and October 2014 confirmed Claimant required regular supervision and assistance due to an unsteady gait, limited mobility of the bilateral lower extremities, and weakness. (Tr. at 630-648.) Notes also indicated Claimant used a cane to ambulate short distances but used a wheelchair to move long distances. (Tr. at 637.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified he was born on September 12, 1978 and lived by himself. (Tr. at 31.) He stated he graduated from high school and was not employed. (Tr. at 32.) He previously worked delivering food for a diner when he was involved in a motor vehicle accident. (Id.) He had also worked at Amazon.com but was unable to perform his duties due to his foot amputation. (Id.) Claimant explained he had also performed some security work that was mostly sedentary, and he had not needed to use a cane while on his feet in that job. (Tr. at 33.) Additionally, he testified he had been a cart pusher at Walmart and had worked in the coal mines. (Tr. at 34-35.)

Claimant stated he was in a wheelchair for approximately seven months after his accident. (Tr. at 35.) He then progressed to using a walker for three or four months. (Tr. at 36.) He then graduated to using a cane, but lost his balance in 2014 and twisted his knee. (Id.) He explained that he still occasionally used his walker due to pain, but mostly for falling. (Tr. at 37.) He confirmed that he could not walk the length of a football field even with the walker. (Id.)

Claimant testified that he did not leave his home much and had a worker who came Monday through Friday to clean and help him in and out of the bathtub. (Id.) On the two days she is not there, he stated he could not cook and clean dishes but could get in and out of the bathtub using rails, although this was riskier than having her assistance. (Tr. at 38.) He explained he lived in a two-story home and had a urinal and potty chair on the first floor so he only had to go upstairs to take a shower every other day. (Id.) He described using a cane and a rail to climb the stairs. (Id.) Claimant also explained he slept in a hospital bed so he could adjust the support and help with his pain. (Tr. at 38-39.)

Claimant stated he had daily pain that he managed by propping himself up, sitting in a

recliner, and resting in bed two to three hours a day. (Tr. at 40.) He indicated he could stand no more than 15 to 20 minutes at a time and could lift a 12-pack of soda. (Tr. at 41.) Claimant testified that he was treated for anxiety; since his accident, he cannot stand to be around people, he has panic attacks and bad depression. (Id.) He stated he did not shop or go to movies or restaurants, but did watch television, play video games, and read. (Tr. at 42.)

        <u>Patricia McFann, Vocational Expert ("VE") Testimony:</u>

        The VE described Claimant's past work to include delivery driver at the unskilled, light level; battery changer, repairer, and charger at the semiskilled, medium level; and security guard at the semiskilled, light level. (Tr. at 46.) The ALJ asked the VE whether work was available for a hypothetical individual with Claimant's vocational profile and controlling RFC. (Id.) The VE responded that the individual would be unable to perform any of Claimant's past work but could perform other work, such as a surveillance system monitor, an order inspector, and a machine operator at the unskilled, sedentary level. (Tr. at 46-47.) The VE confirmed these jobs would still be available to an individual with the controlling RFC who used a cane or could rarely perform postural activities. (Tr. at 47-48.) The VE also stated that no jobs would exist for an individual who was off task 60 minutes per day beyond the regularly scheduled breaks. (Tr. at 48.) Lastly, the VE confirmed that the required use of a walker would preclude sedentary work. (Tr. at 49.)

**<u>Scope of Review</u>**

        The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As mentioned *supra*, Claimant alleges the ALJ erred in finding his mental impairments non-severe at step two of the sequential evaluation process, resulting in a flawed RFC because none of the mental limitations found by State agency consultants were asked of the vocational expert during her testimony. (Document No. 10 at 9-12.)

Determining Severe Impairment:

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Id. §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1521(b), 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a); SSR 96-3, 1996 WL 374181. Additionally, the impairment must not "*be reasonably controlled by medication or treatment*[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (emphasis added). Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

In this case, the ALJ acknowledged Claimant's diagnoses of major depressive disorder, severe with psychotic features following the psychological examination provided by Ms. Glick. (Tr. at 11.) The ALJ noted Claimant never received "treatment from a specialist" for his mental impairments, though recognized that he received prescriptions for Prozac from his primary care provider for anxiety; the ALJ further noted that Claimant's primary care provider's treatment records found his "concentration and memory was normal." (Id.) Accordingly, the ALJ determined

that Claimant's mental impairments were "non-severe." (Id.)

When an adjudicator fails to list an additional impairment as severe at step two, it is not reversible error if the adjudicator finds at least one other severe impairment and continues with the remaining steps in the sequential evaluation process. Ashby v. Colvin, 2015 WL 1481625, at *9 (S.D.W. Va. Mar. 31, 2015). The ALJ considered Claimant's impairments in the subsequent steps in the sequential evaluation process, performing the "special technique" pursuant to Sections 404.1520a and 416.920a, finding that Claimant had mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace; the ALJ found no episodes of decompensation, which have been of extended duration. (Tr. at 11-12.)

The ALJ considered the opinions provided by the State agency psychological consultants who opined that Claimant had moderate limitations in the first three functional areas, and no episodes of decompensation of extended duration. (Tr. at 12.) The ALJ noted they opined Claimant would be capable of "semi-skilled work at a reduced pace, with some supervision, low social demands, and low public interaction. . . [t]hey stated the claimant was capable of adapting to working settings." (Id.) The ALJ gave these opinions little weight "because treatment records received at the hearing level shows the claimant is not as limited." (Id.) Again, the ALJ referenced the primary care provider prescriptions for Prozac and noted Claimant's concentration and memory were normal, and that Claimant did not seek specialized treatment for his mental conditions. (Id.)

There is no question that the record is sparse concerning Claimant's mental health treatment, and it is known that the RFC assessment is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d). Though the ALJ's determination that Claimant's mental impairments were non-severe contradicts the findings of the State agency consultants, an adjudicator is not bound

by medical opinions only:

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Contrary to Claimant's assertion that the ALJ only "selectively plucked" statements from Claimant's Adult Function Reports and that he never sought treatment from a mental healthcare specialist to support his conclusion (Document No. 10 at 11-12.), significantly, the ALJ noted that Claimant's primary care provider prescribed Prozac for anxiety, "but noted his concentration and memory was normal (Exhibit 11F)." (Tr. at 11, 12, 608-629.) As discussed *supra*, the medical records from Lincoln Primary Care Center contains the **only** mental health treatment Claimant received during the relevant period, and his primary care physicians have not indicated he suffered from a severe mental impairment, as their treatment notes suggest only minimal limitations as found by the ALJ. Indeed, the primary care treatment records indicate that Claimant's mental impairments were "reasonably controlled" by medication, and recommended no further or additional treatment for his anxiety and/or depression. Gross, 785 F.2d at 1166. In short, the ALJ reconciled this conflicting medical evidence, and determined Claimant's mental impairments were not severe.[3]

Accordingly, the undersigned **FINDS** the ALJ's determination that Claimant's mental impairments were non-severe at step two is supported by substantial evidence.

---

[3] The undersigned notes that the State agency opinion evidence pre-dated the treatment records obtained from Lincoln Primary Care Center, which was noted by the ALJ in his decision, and further bolsters the ALJ's determination that Claimant was not as limited by his mental impairments. (Tr. at 12.) It is further noted that there is no opinion or evidence of record that indicated Claimant was disabled or incapable of work due to his mental impairments.

<u>Meeting or Medically Equaling a Listed Impairment:</u>

As stated above, Claimant asserts the ALJ's inadequate and conclusory step three finding contained no explanation or discussion of the probative evidence, particularly with regard to Claimant's use of a hand-held assistive device for ambulation. (Document No. 10 at 12-14.) The ALJ explicitly determined that Claimant's "left knee and tibia impairment does not meet or medically equal the criteria of listing 1.02 or 1.06. (Tr. at 12.) The ALJ then provided the following language:

> The record contains no evidence of gross anatomical deformity and chronic joint pain and stiffness with signs of limitations of motion or other abnormal motion of the affected joint(s), and finding on appropriate medically acceptable imaging of joint space narrowing, bone destruction, or ankylosis of the affected joint(s) with involvement of one major peripheral weight bearing joint, resulting in inability to ambulate effectively, as defined in 1.00B2b; or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

(Tr. at 12-13.) Of interest to this case, the SSA issued Social Security Ruling 96-9p providing further guidance when the issue of hand-held assistive devices arises:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an

unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

See, *Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *7. (**bold** in original)

With respect to Claimant's use of the hand-held assistive devices, the ALJ noted several references in the decision, beginning with Claimant's testimony:

He testified he was involved in an accident and was subsequently confined to a wheelchair for seven months. He stated he used a walker for several months and then later was able to use a cane. He advised he injured his knee in 2014 and had to undergo two additional surgeries. The claimant reported he continues to use a walker a great deal.

(Tr. at 13.) Regarding the medical evidence of record, the ALJ noted that on January 23, 2013, orthopedist Dr. Storm reported Claimant's x-rays indicated he "was healing well", he "was advanced to weight bearing as tolerated", weaned him off his cam boot and discontinued his knee immobilizer, but prescribed Claimant a walker. (Tr. at 14.) "However, two months later treatment records show he was ambulating with a cane (Exhibit 13F)." (Tr. at 14, 649-680.)

The ALJ noted further that a record dated May 13, 2013 from Claimant's primary care provider noted "only slight muscular weakness of left leg. He ambulated with a cane[.]" (Tr. at 14.) Subsequently, on July 31, 2013, "examination revealed normal tone and motor strength, as well as normal gait and station." (Id.) "In addition, coordination and cerebellum was normal." (Id.) As pointed out by Claimant, the ALJ then

21

notes that although records indicate the claimant ambulated with assistance from a cane, and acknowledges that although a cane may be necessary as part of rehabilitation from injuries, the evidence fails to establish that a cane remains medically necessary. The consultative examiner specifically stated that the cane was not medically necessary (Exhibit 7F). Primary care records do not document the need for a cane, and indeed do not even mention that the claimant utilizes one. (Exhibit 13F). Other primary records note normal gait[4] and station (Exhibit 11F).

(Tr. at 14, 544-549, 608-629, 649-680.)

Clearly, as pointed out by Claimant, the ALJ contradicted himself when he initially noted that Claimant's primary care provider records showed that he ambulated with a cane, and then stated their records do not mention he used one. (Document No. 10 at 13-14.) Perhaps a more glaring inconsistency is the following finding by the ALJ: "Home health records dated September 2014, show that while the claimant needed some assistance with dressing, ***he did not need assistance*** getting in [and] out of [the] shower or washing himself (Exhibit 12F)." (Tr. at 15, 630-648.) (emphasis added). The undersigned's review of that treatment note indicates the exact opposite: "Client does need assistance with getting in/out of shower and washing his lower body d/t weakness of legs and unsteady gait." (Tr. at 635.)

In addition to the contradictory and inconsistent findings from the record of evidence, Claimant has also asserted that the ALJ's step three analysis is inadequate because he did not mention the personal care records from Loved Ones In Home Care that indicated Claimant "needs supervision with walking [due to] unsteady gait, weakness, and limited mobility of [bilateral lower

---

[4] The undersigned finds it remarkable that the record of evidence demonstrated that an individual who had "3/4" of his left foot amputated (Tr. at 631.), at the arch (Tr. at 650.), which "interferes with his ability to balance and perform walking maneuvers" during a consultative evaluation (Tr. at 548.), can still nonetheless, have a "normal gait." (Tr. at 615, 620, 625.) Interestingly, Claimant's primary care provider treatment records themselves appear to contain inconsistencies and/or contradictions: on July 31, 2013 Claimant was "ambulating normally" (Tr. at 609.); on November 5, 2013, Claimant "is permanently disabled due to orthopedic problems", but demonstrated "normal gait and station" (Tr. at 614, 615.); on January 28, 2014 and April 28, 2014, Claimant had "normal gait and station", but also "limited ambulation and ambulation with cane." (Tr. at 619, 620, 624, 625.)

extremities]. Client uses cane for short distances, and [wheel chair] for long distances." (Document No. 10 at 14; Tr. at 637.)

There is no dispute that the ALJ did not mention this specific treatment note. In fact, the ALJ's supposed review of the September 2014 treatment notes from Loved Ones In Home Care consistently showed that Claimant "needs assistance with lower body dressing, and assistance getting socks/shoes on"; that he "does need supervision with transferring on/off furniture d/t weakness, limited mobility of BLE, and unsteadiness"; and importantly, that he "needs supervision with walking d/t unsteady gait, weakness, and limited mobility of BLE. Client uses cane for short distances, and W/C for long distances." (Tr. at 636, 637.)

Indeed, Loved Ones records dated October 9, 2014 continued to document that Claimant used a walker, cane, shower chair, and "grab bars" in the home. (Tr. at 642.) Moreover, he required "partial" assistance from caregivers for getting in and out of a shower and for washing his lower body, dressing his lower body, putting on socks and shoes, and performing "essential errands" such as going to the grocery store, pharmacy, and to doctor's appointments. (Tr. at 643, 647.) Additionally, those records indicate that Claimant required "supervision" for "ambulation", "transfer", and "toileting[5]" due to "unsteady gait." (Tr. at 643.) Notably, Loved Ones records expressly provide that due to Claimant's physical impairments, his personal care plan required "***FALL PRECAUTIONS***". (Tr. at 647.)

The undersigned notes that the ALJ gave "great weight" to Dr. Gajendragadkar's medical opinion because it was "based on the consistency with the evidence of record", and that the ALJ acknowledged the May 13, 2013 primary healthcare provider record documenting Claimant's left

---

[5] Toileting also required "partial" assistance from caregivers. (Tr. at 643.)

leg muscular weakness and use of a cane, lending support for the sedentary RFC assessment. (Tr. at 16.) Nevertheless, the glaring inconsistencies and contradictory findings of fact from probative medical evidence documenting Claimant's use a hand-held assistive devices and fall precautions from in-home service providers gives the undersigned great pause in finding substantial evidence supports the ALJ's step three analysis. In sum, the ALJ's failure to **correctly** and **adequately** consider the September 2014 personal care records documenting Claimant's use of a cane manifested error.

In addition, SSR 96-9p provides that "if a medically required hand-held assistive device is needed **only for prolonged ambulation**, walking on uneven terrain, or ascending or descending slopes, **the unskilled sedentary occupational base will not ordinarily be significantly eroded.**" 1996 WL 374185, at *7. (emphasis added) Loved Ones treatment records indicated Claimant needed a hand-held assistive device for just "short distances." Claimant required at least "partial" assistance with basic functions, and "supervision" for ambulating, which falls under 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 1.00B2b:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel **without companion assistance** to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace

24

with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation. (emphasis added)

Undisputedly, Claimant has an in-home caregiver, and interestingly, the October 9, 2014 "environmental assessment" provided by Loved Ones staff noted three people resided in Claimant's home (Tr. at 646.), whereas by the time of the administrative hearing, he lived alone because his fiancée (and her daughter) left him. (Tr. at 31.) It appears to the undersigned, that since Claimant lives alone, the need for "companion assistance" as envisioned by the Agency's own Ruling in order for Claimant to go to the grocery store, to doctor's appointments, and the fact he requires "partial" assistance and/or "supervision" for basic functions like bathing and toileting, underscores the error in the ALJ's step three finding. (Tr. at 643, 647.)

In short, the undersigned **FINDS** the ALJ's step three analysis was inadequate, insofar as it did not address Claimant's use of hand-held assistive devices, and the resulting RFC assessment concerning Claimant's physical impairments lacked the narrative discussion that allows for meaningful judicial review and thus, failed to "build an accurate and logical bridge from the evidence to his conclusion." See <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (quoting <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000)).

Therefore, the undersigned **FINDS** that the ALJ's step three analysis and resulting physical RFC assessment were not supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for judgment on the pleadings to the extent he requests this matter

be remanded for the correction of the errors noted *supra* (Document No. 10.), **DENY** the Defendant's request to affirm the decision below (Document No. 11.), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order for the ALJ to properly address Claimant's use of hand-held assistive devices due to his orthopedic impairments at step three of the sequential evaluation process.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 1, 2017.

Omar J. Aboulhosn
United States Magistrate Judge